820 F.2d 923
 Betty Jean HARPOLE, Individually and as Administratrix of
the Estate of Gary Demay, Deceased, Appellant,
v.
The ARKANSAS DEPARTMENT OF HUMAN SERVICES, Ray Scott,
Director; Dr. Curtis Ivery, Director of the Social Services
Division; Roy Kimball, Director of Pulaski County Social
Services North Office; and Marilyn Carter, Supervisor,
Pulaski North Social Services; Billey Burke, Supervisor;
Debbie Burgess, Case Worker, P.N.S.S.; Arkansas Children's
Hospital; Randall L. O'Donnell, Chief Executive Officer;
Jeanette Purdue, Director Social Services and Support; Dr.
Debra Fiser, Staff Physician; Tommie Flowers-Baker, and as
Social Worker for the Arkansas Children's Hospital; in
their Individual and Official Capacities, Appellees.
 No. 86-2105.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 16, 1987.
Decided June 3, 1987.
Rehearing and Rehearing En Banc Denied July 15, 1987.
 
 Richard Quiggle, Little Rock, Ark., for appellant.
 Laura A. Hensley, Little Rock, Ark., for Arkansas Childrens Hosp., et al.
 Kay J. Jackson Demailly, Asst. Atty. Gen., Little Rock, Ark., for State of Arkansas Dept. of Human Services, et al.
 Before ROSS, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Plaintiff appeals from the district court's[1] order granting defendants' motion to dismiss in this 42 U.S.C. Sec. 1983 case. The district court held that the pleadings failed to state a claim upon which relief can be granted. For the reasons stated below we affirm.
 
 I. BACKGROUND
 
 2
 The facts in this case compel sympathy for Betty Jean Harpole, grandmother of four small children, two of whom died as a result of Sudden Infant Death Syndrome and two of whom died as a result of apnea.[2] This case stems out of the last of these tragic events--the February 8, 1984 death of two-and-one-half month-old Gary Demay.
 
 
 3
 Gary Demay was born on November 19, 1983. Betty Demay, mother of Gary and the three other deceased children, is the adopted daughter of plaintiff Harpole. On November 21, 1983 Gary was admitted to Arkansas Children's Hospital to determine if he was apnea prone and after a series of tests Gary's doctors concluded that he probably was. The Arkansas Department of Social Services was notified of possible abuse and neglect. The Pulaski County North Office of Social Services conducted an investigation and found no evidence of abuse or neglect. On December 15, 1983, despite uneasiness felt by hospital personnel, Gary was discharged.
 
 
 4
 On both January 8, and January 14, 1984 Gary was returned to the hospital because he had suddenly stopped breathing. After each admission, however, Gary was discharged to his mother's care. On February 8, 1984, Gary stopped breathing and died. His mother had forgotten to activate the apnea moniter, which would have sounded an alarm when Gary stopped breathing. Demay had also forgotten to turn on the monitor the day her third child stopped breathing and died.
 
 
 5
 Harpole filed this suit on her own behalf and as administratrix of Gary Demay's estate. She alleged that Gary's First, Fourth, Eighth, Ninth, and Fourteenth Amendment rights have been violated because the defendants violated duties imposed by Arkansas statutes and Titles IV and XX of the Social Security Act. She also sued, on her own behalf, for damages proximately caused by Gary's death.
 
 
 6
 The district court held that Harpole's complaint, at best, states a cause of action in tort for negligence. The district court also held that to the extent that the complaint sought to require state officials to enforce state law, it was barred by the Eleventh Amendment.
 
 
 7
 On appeal Harpole argues that the defendants were deliberately indifferent to the needs of Gary and as a result his and her own constitutional rights were violated. Also, Harpole argues that the Eleventh Amendment is inapplicable because the suit was not brought solely to remedy state law violations. State law created affirmative duties, the breach of which is a constitutional violation, Harpole argues.
 
 II. DISCUSSION
 
 8
 Federal Rule of Civil Procedure 12(b)(6) provides for dismissal "for failure to state a claim upon which relief can be granted." Whether Harpole's complaint states a claim upon which relief can be granted is a legal question which this court will review de novo. See Morton v. Becker, 793 F.2d 185, 187 (8th Cir.1986). We will affirm the district court's dismissal only if it appears beyond doubt that Harpole can prove no facts which would entitle her to relief.
 
 
 9
 To state a claim under 42 U.S.C. Sec. 1983 Harpole must "allege deprivation of a right, privilege or immunity secured by the Constitution and laws of the United States through the conduct of persons acting under color of state law." Id. Therefore, we must determine whether the facts, as alleged by Harpole, if proved, would show that defendants have deprived Harpole or Gary of any federally protected rights.[3]
 
 
 10
 A close reading of Harpole's complaint shows that she is pursuing several different claims. As administratrix of Gary's estate she seeks to recover damages on his behalf. In this capacity she alleges that by violating state law, defendants deprived Gary of his constitutional rights. She also alleges that defendants violated Titles IV and XX of the Social Security Act. On her own behalf Harpole seeks damages for alleged violations of her own constitutional rights as well as for alleged violations of the Social Security Act.
 
 
 11
 In her complaint Harpole alleges that defendants violated the First, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution. She provides no authority supporting First, Eighth, or Ninth Amendment violations, and we see no reason to discuss these allegations. The Fourteenth Amendment, however, has been construed to offer redress for victims of unlawful conduct of state actors.
 
 
 12
 As primary support for her position Harpole cites Doe v. New York Dep't of Social Services, 649 F.2d 134 (2d Cir.1981). In Doe, a child brought an action under Sec. 1983 alleging that her constitutional rights had been violated when the agency which placed her in a foster home failed to supervise her placement adequately and as a result she was raped and beaten by her foster father. The court in Doe stated, "[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution. Thus, non-performance of such constitutional duties has been held to give rise to Sec. 1983 cause of action for prisoners." Id. at 141. The court stated that a cause of action under Sec. 1983 would exist if the plaintiff could prove that the agency's nonfeasance was caused by deliberate indifference.
 
 
 13
 The facts in the present case are quite different than those in Doe, however. The plaintiff in Doe was in the legal custody of the New York City Commissioner of Welfare--Gary Demay was always in his mother's legal custody. In Doe, the agency failed to report child abuse even though it was required by statute to do so. The court stated:
 
 
 14
 The more a statute or regulation clearly mandates a specific course of conduct, the more it furnishes a plausible basis for inferring deliberate indifference from a failure to act * * * * This is because failure to undertake a specific course of action in vindication of a general duty can reasonably be attributed to a bona fide difference of opinion as to how the duty should be performed. However, no such alternative explanation for nonfeasance can be raised where the task mandated is specific and unequivocal.
 
 
 15
 Id. at 146.
 
 
 16
 In the present case no affirmative duties under Arkansas law were violated. Harpole cites three Arkansas statutes, none of which are written in mandatory terms. The first statute, Ark.Stat.Ann. Sec. 45-423 (1977), provides that "[a]ny adult may file * * * a petition in writing setting forth facts concerning a juvenile which, if true, would render such juvenile * * * dependent-neglected within the meaning of this Act." (emphasis added) Section 45-438 provides that "Social Services or their designee may file a petition * * * alleging the specific facts that are relied upon and the dates of the alleged acts to show probable cause that the juvenile is dependent-neglected." Ark.Stat.Ann. Sec. 45-438 (Supp.1985) (emphasis added). Likewise, Ark.Stat.Ann. Sec. 42-811 (1977) provides that "a designated employee of the city or county department of social services, may take a child into protective custody or any person in charge of a hospital or similar institution or any physician treating a child may keep that child in his custody without the consent of the parent * * * * " (emphasis added).
 
 
 17
 By their terms these statutes allow the exercise of discretion. Absent something more than an undesirable result we can not say that the defendants' exercise of their discretion rose to the level of a constitutional violation. At best, defendants may have been negligent when returning Gary to his mother's care, but negligence is not actionable under Sec. 1983. See Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); Griffin v. Hilke, 804 F.2d 1052, 1055 (8th Cir.1986). The State of Arkansas does not have a duty to provide around-the-clock services to every sick child, nor must it monitor family relationships closely enough to prevent children from being injured by the negligence of their parents.
 
 
 18
 The state does not have a duty enforceable by the federal courts to maintain a police force or a fire department, or to protect children from their parents. The men who framed the original Constitution and the Fourteenth Amendment were worried about government's oppressing the citizenry rather than about its failing to provide adequate social services.
 
 
 19
 DeShaney v. Winnebago County Dep't of Social Services, 812 F.2d 298, 301 (7th Cir.1987).
 
 
 20
 Several other circuits have dealt with Sec. 1983 suits arising out of state agencies failing to protect children from dangerous home environments. For example, in Estate of Bailey v. County of York, 768 F.2d 503 (3rd Cir.1985), the court recognized a cause of action under Sec. 1983 where the York County Children and Youth Services failed to investigate an abused child's home before returning the child to it, resulting in the child's death a month later. In Bailey, the agency failed to conduct an investigation even though it was aware that the child faced special danger. The agency's knowledge of the dangerous situation, the court stated, created a special relationship between the agency and the child which placed a duty on the agency to protect the child. Id. at 510-11. See also Jensen v. Conrad, 747 F.2d 185, 190-94 (4th Cir.1984) (recognizing special relationships), cert. denied, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985).
 
 
 21
 The Seventh Circuit, however, has expressly rejected the idea that special relationships exist in situations other than between a prison and its inmates. DeShaney, 812 F.2d at 303-04. We agree with the Seventh Circuit that "[w]e can find no basis in the language of the due process clauses or the principles of constitutional law for a general doctrine of 'special relationships.' " Id.
 
 
 22
 The concept of special relationships began in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), where the Supreme Court held that deliberate indifference to an inmate's serious medical needs violated the Eighth Amendment. The Court reasoned that elementary principles of Eighth Amendment jurisprudence require the government to provide medical care for those it incarcerates because the government is the only means inmates have of satisfying their medical needs. Id. at 103, 97 S.Ct. at 290.
 
 
 23
 The expansive reading given by the Third and Fourth Circuits to special relationships developed from Estelle and from dicta in Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). Martinez involved the murder of a young girl by a mentally disturbed parolee. The Court ruled that the plaintiffs failed to state a cause of action under Sec. 1983 because the murder was too remote to be attributed to the state. "Although the decision to release Thomas from prison was action by the State, the action of Thomas five months later can not be fairly characterized as state action." Id. at 284-85, 100 S.Ct. at 558-59. Particularly important to the Third and Fourth Circuits in Bailey and Jensen was the statement that
 
 
 24
 the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole."
 
 
 25
 444 U.S. at 285, 100 S.Ct. at 559.
 
 
 26
 From this language the Third and Fourth Circuits have found that special relationships requiring affirmative protection can exist outside of the prison environment. Bailey, 768 F.2d at 510-11; Jensen, 747 F.2d at 190-94. We disagree. As noted in DeShaney, it is not the role of federal courts to look over the shoulders of state agencies to ensure that they "act with some minimum competence in overseeing the child's welfare." 812 F.2d at 304. As an appellate court, we should not rely solely on dicta, even Supreme Court dicta, when making decisions with constitutional implications. Logic and principle should control how much deference we give to the statement in Martinez. The facts in the present case do not support the finding of a special relationship because the massive state control found in the prison environment is absent here. Without that control there is no constitutionally mandated duty to protect one private citizen from another. We do not believe that the concept of special relationships was intended to extend beyond prison or prison-like environments.
 
 
 27
 The final issue in Harpole's Fourteenth Amendment claim is whether any of Harpole's constitutionally protected interests were violated. In order to be successful in her individual capacity Harpole must allege that she has been deprived of liberty or property. It is not enough that Gary lost his life--Harpole must also have suffered a loss to a constitutionally protected interest. We do not believe that she has suffered such a loss.
 
 
 28
 Both the Supreme Court and this court have recognized a liberty interest which parents and children have in each other's companionship. See, e.g., Lehr v. Robertson, 463 U.S. 248, 258, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614 (1983); Myers v. Morris, 810 F.2d 1437, 1462-63 (8th Cir.1987). Familial relationships have been protected from many forms of governmental intrusion. See, e.g., Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (ordinance making it unlawful for grandmother to live with grandson declared unconstitutional); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (recognized fundamental interest of parents in guiding their children's future).
 
 
 29
 The First Circuit, in Ortiz v. Burgos, 807 F.2d 6 (1st Cir.1986), divided constitutionally protected interests in familial relationships into two categories. In the first category are cases protecting the right to make private decisions affecting the family, such as whether to bear children. "The emphasis in these cases on choice suggests that the right is one of preemption; rather than an absolute right to a certain family relationship, family members have the right, when confronted with the state's attempt to make choices for them, to choose for themselves." Id. at 8. The second category contains cases dealing with governmental attempts to directly affect the parent-child relationship by means such as determining paternity or terminating parental rights. Id.
 
 
 30
 Based on this analysis of the protection given familial relationships, the court in Ortiz found that a stepfather, three brothers, and one sister did not have a protected liberty interest in the companionship of their adult son and brother who was allegedly beaten to death by prison guards. The court found a significant difference between government actions which directly affect the relationship between a parent and a minor child and actions which indirectly affect the relationship between parent and adult child. The court also stressed the fact that a stepfather, rather than a natural father was bringing suit. Finally, the court noted that recognizing a protected liberty interest in that situation "would constitutionalize adjudication in a myriad of situations we think inappropriate for due process scrutiny, including the alleged wrongful prosecution and incarceration of a child or the alleged wrongful discharge of a child from a state job, forcing the child to seek employment in another part of the country." Id. at 9.
 
 
 31
 We do not believe that the drafters of the Fourteenth Amendment intended to protect from government interference every conceivable family relationship, no matter how far removed. Further, it is illogical to believe that federal law requires that money be paid to a grandmother whose grandchild is injured by the state. Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct.
 
 
 32
 Harpole also argues that defendants violated Titles IV and XX of the Social Security Act. In Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that Sec. 1983 may encompass claims based on a state actor's violation of a federal statute. The statute, however, must create enforceable rights. Middlesex City Sewerage Auth. v. Nat'l Sea Clammers Assoc., 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981). Harpole does not suggest that under these circumstances the Social Security Act creates a private cause of action for monetary damages and we fail to see how Congress intended to create enforceable rights in this situation. Title IV authorizes grants to states to provide aid and services to needy families with children and to provide child-welfare services. 42 U.S.C. Sec. 601 et seq. (1982). Title XX authorizes block grants to states for social services. 42 U.S.C. Sec. 1397 et seq. (1982). These statutes were enacted to enable states to provide financial assistance to needy persons and not as a means of seeking compensation when one of those persons is indirectly injured by the state.
 
 CONCLUSION
 
 33
 We affirm the district court's order dismissing Harpole's complaint for failure to state a claim upon which relief can be granted because 1) defendants did not violate any affirmative duties under Arkansas law; 2) Gary Demay and the defendants were not in a special relationship; 3) Harpole did not suffer a loss of a constitutionally protected interest; and 4) Titles IV and XX do not create enforceable rights under the facts in this case.
 
 
 
 [1]
 The Honorable William R. Overton, United States District Judge for the Eastern District of Arkansas
 
 
 [2]
 Apnea is a sudden cessation of breathing
 
 
 [3]
 During oral argument we asked the parties to respond to an issue not raised in the district court--whether the conduct of Arkansas Children's Hospital constitutes state action. After reviewing the parties' responses we are satisfied that the hospital acted under color of state law. See Ark.Stat.Ann. Sec. 7-501 (1976) (recognizing Arkansas Children's Hospital as an agency of the State of Arkansas)
 The hospital argues that this statute was repealed by implication in 1975 by the enactment of Ark.Stat.Ann. Sec. 42-807 et seq. which gave the State Social Services Department control over abused and neglected children. Our research has found nothing suggesting that Sec. 7-501 has been repealed, by implication or otherwise, and until such time as it is repealed we will treat the hospital as an agency of the state.